**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | |
|---|---|
| JOHNATHAN SEXTON, | Case No. 1:14-cv-26 |
| Plaintiff, | Dlott, J.<br>Bowman, M.J. |
| v. | |
| INSTITUTIONAL INSPECTOR MAHALMA, et al., | |
| Defendants. | |

**REPORT AND RECOMMENDATION**

**I. Procedural Background**

Plaintiff, presently a prisoner at the Marion Correctional Institution, filed this §1983 action concerning an incident that occurred while he was a pretrial detainee incarcerated at the Hamilton County Justice Center ("HCJC"). On January 9, 2014, Plaintiff filed suit against Hamilton County Sheriff Jim Neil and two HCJC correctional officers, Cory Jones and David Smucker. (Doc. 1, Complaint, p. 4). On October 20, 2014, the undersigned filed a Report and Recommendation ("R&R") recommending that the motion for judgment on the pleadings filed by Defendants Cory Jones and David Smucker be granted, dismissing all claims against those Defendants. (Doc. 29). That R&R was adopted on November 17, 2014. (Doc. 34).

On October 21, 2014, the sole remaining Defendant, Sheriff Jim Neil, filed a motion for summary judgment. (Doc. 32). After being directed to show cause why that motion should not also be granted, Plaintiff filed a response, to which Defendant has

filed a reply. (Docs. 39, 41). For the reasons that follow, I now recommend that Defendant Neil's motion be GRANTED.

## II. Allegations of Plaintiff's Complaint

Plaintiff claims that on February 9, 2013, while housed in HCJC's "protective custody pod," he was "brutally attacked and stabbed by three inmates" when Correctional Officers Jones and Smucker were on duty with Jones "working control" and Smucker making "rounds and serv[ing] chow." (Doc. 3, at 5-6). Plaintiff alleges that shortly after 9:30 p.m., inmate Dubose came into his cell and attacked him "without provocation." (*Id.*, at 5). The fight lasted "several minutes" until Plaintiff gained "the upper hand" and threw Dubose out of the cell. (*Id.*). Plaintiff avers that he used the nearest intercom to call for help but after receiving no reply, went to use the intercom in the pod. (*Id.*). Shortly thereafter, two inmates who allegedly had been bribed by inmate Debose "came charging up the stairs and tackled" Plaintiff. (*Id.*). Plaintiff alleges that inmates Carter and Hopper dragged him into an alcove where they beat him and Hopper stabbed him with a Bic pen. (*Id.*). The attack ended "only when the guard called for 'lock-down'" around 9:45 p.m. (*Id.*). Plaintiff alleges that he again called on the intercom after returning to his cell. (*Id.*). Defendant Jones answered, but after being informed that Plaintiff had "been jumped" and needed help, Jones replied that "he could not leave his post . . . as he was the only officer in the booth." (*Id.*). Plaintiff alleges that help "finally" arrived around "9:50 p.m" when "[m]edical responded and 911 was called." (*Id.*). Plaintiff alleges that he was diagnosed with a broken nose, two stab wounds in the back of the head, a concussion and multiple bruises. (*Id.*). Upon his return to HCJC several hours later, Plaintiff alleges he "was admitted to medical and stayed there for

several days." (*Id.*). Plaintiff claims that he suffered from and was treated for "dizzy spells for about a month thereafter." (*Id.*).

Plaintiff received a "disciplinary write-up" for his involvement in the incident. (*Id.*, at 6). He was "given 20 days of cell isolation." (*Id.*). Plaintiff admits that he used a pencil to stab inmate Dubose, but contends that he "was only defending" himself. He alleges he unsuccessfully appealed the disciplinary action taken against him. (*Id.*). In an affidavit submitted in support of Defendant Neil's motion for summary judgment, Captain Scheffler states that a criminal investigation was conducted but closed without any criminal charges filed, after investigators were unable to determine which inmate was the first aggressor. (Doc. 32-1 at ¶6).

Plaintiff filed two grievances while at HCJC: (1) a February 5, 2013 grievance alerting authorities to possible drug trafficking in the unit; and (2) a request to be permitted to shave at night prior to a trial appearance the following morning. (Doc. 32-1). Plaintiff contends the February 5 grievance was sufficient to put Defendants on notice of his fear of other inmates.

On initial screening, the undersigned construed Plaintiff's complaint as one alleging a violation of his Eighth Amendment right to be free from cruel and unusual punishment. The relevant portion of Plaintiff's complaint alleges:

> There was no reason for such activity to go unnoticed for such an extended period of time. Two officers (Jones & Smucker) were assigned to south 42 that night. . . . Officer Smucker was not at his post when this violence was occurring. I saw Officer Jones playing on his phone. From the guards booth, one can get a complete view of all four pods as well as all of the cells. All the officer has to do is look out the window from the booth to observe what is occurring. . . . Consider also that this floor has a protective custody unit. The very nature of P.C. implies extra security and measures be taken for the safety of any such inmate. On this given night, all one had to do was observe what was happening in the pod. . . .

3

> In conclusion, I want to bring attention to the conditions and overcrowding that are plaguing this jail. . . . Whether due to staff negligence or shortages, the level and severity of violence that was able to persist that night was unacceptable. I was left to languish in my cell for some 10 minutes until help arrived. I was then punished for defending myself when I had no other recourse.

(*Id.*). Plaintiff's complaint sought $60,000 in compensatory damages and $60,000 in punitive damages from each Defendant. (*Id.*, at 7).

Under 28 U.S.C. §1915(e)(2)(B), the undersigned initially permitted Plaintiff's claims against Defendants Jones and Smucker for their alleged failure to protect Plaintiff from the inmate assault/altercation to proceed for further development. The Court also directed Defendant Neil to respond to Plaintiff's claim that "overcrowding" at the jail and inadequate security played a role in the February 9, 2013 incident. However, the Court held that other allegations failed to state any claim, including: (1) Plaintiff's allegation that defendant Neil should be held liable, in a supervisory capacity, for Jones' and Smucker's alleged misconduct during the February 9, 2013 incident; (2) Plaintiff's challenge to the disciplinary action that was taken against him for his involvement in the incident; (3) any potential challenge to the procedural handling of Plaintiff's grievance; and (4) any claim for "negligence" in failing to protect Plaintiff from the alleged inmate assault. (Docs. 4, 9, 17).

Subsequently, Defendants Jones and Smucker filed a motion for judgment on the pleadings, which was granted. (Doc. 24). Therefore, as stated, all claims against Defendants Jones and Smucker have been dismissed. For the reasons that follow, Sheriff Neil's pending motion for summary judgment on the "overcrowding" and/or lack of "security" claim also should be granted.

## II. Analysis

### A. Summary Judgment Standard

In a motion for summary judgment, a court must view "the facts and any inferences that can be drawn from those facts – in the light most favorable to the nonmoving party." *Keweenaw Bay Indian Comm. v. Rising*, 477 F.3d 881, 886 (6th Cir. 2007) (internal quotation marks omitted). "Summary judgment is only appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Id.* (quoting Fed.R.Civ.P. 56(c)) (internal quotation marks omitted). "Weighing of the evidence or making credibility determinations are prohibited at summary judgment – rather, all facts must be viewed in the light most favorable to the non-moving party." *Id.*

The requirement that the facts be construed in the light most favorable to the Plaintiff, however, does not mean that the court must find a factual dispute where record evidence contradicts Plaintiff's wholly unsupported allegations. After a moving party has carried its initial burden of showing that no genuine issues of material fact remain in dispute, the burden shifts to the non-moving party to present specific facts demonstrating a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 582 (6th Cir. 1992) (citing *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)). In order to defeat the motion for summary judgment, the non-moving party must present probative evidence that supports its complaint. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).

The non-moving party's evidence "is to be believed, and all *justifiable* inferences are to be drawn in his favor." *Id.* at 255 (emphasis added). The court determines whether the evidence requires submission to a jury or whether one party must prevail as a matter of law because the issue is so one-sided. *Id.* at 251-52.

Although reasonable inferences must be drawn in favor of the opposing party, *see Matsushita*, 475 U.S. at 587, inferences are not to be drawn out of thin air. To demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts …. Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.*, 475 U.S. at 586-87 (citation omitted). It is the plaintiff's burden to point out record evidence to support his claims. "[T]he Court has no duty when deciding a motion for summary judgment to scour the record for evidence that supports a plaintiff's claims." *Abdulsalaam v. Franklin County Bd. of Com'rs*, 637 F. Supp.2d 561, 576 (S.D. Ohio 2009) (citing *Williamson v. Aetna Life Ins. Co.*, 481 F.3d 369, 379 (6th Cir. 2007)).

### B. Grounds Asserted in Defendants' Motion

#### 1. Absolute and/or Qualified Immunity

The only claim against Defendant Neil is that "overcrowding" contributed to the inmate-on-inmate violence that occurred on February 9, 2013. Claims pertaining to overcrowded conditions are generally reviewed under a qualified immunity standard. *See, e.g., Birrell v. Brown*, 867 F.2d 956 (6th Cir. 1989). However, because of the unique history of HCJC, Defendant Neil argues that he is entitled to absolute immunity against Plaintiff's overcrowding claim, rather than merely qualified immunity.

As Defendant notes, staffing and population levels at HCJC have previously been litigated in this Court, beginning in 1976 when the Legal Aid Society of Cincinnati, acting on behalf of a class of inmates, filed suit.  *See Heath v. DeCoursey*, Case No. 1:76-cv569.  While that case was pending, construction was completed on the building now known as the Hamilton County Justice Center ("HCJC"), which began receiving inmates in the fall of 1985.  (Doc. 32-1 at ¶3).   The original *Heath* litigation culminated in an agreed consent order on September 25, 1985 (Doc. 169), establishing staffing and population limits, which order was modified several times over the following years.  *See, e.g., Heath v. DeCourcy ("Heath I")*, 704 F. Supp. 799 (1988); *Heath v. DeCourcy II*, 888 F.2d 1105 (6th Cir. 1989); *Heath v. DeCourcy III*, 992 F.2d 640 (6th Cir. 1993); *Heath v. DeCourcy IV*, 64 F.3d 663 (6th Cir. 1995)(Table, text available at 1995 WL 492918). The last of the modifications permitted double celling under most circumstances, and established a population cap at HCJC of 1,240 inmates, which could be exceeded by 25% under special conditions.  *Heath IV* at 1.  The terms of the agreed consent order were subject to varying sunset provisions, the longest of which was twenty years for population, staffing, and inmate classification.  *Heath III*, 992 F.2d at 632.  Although the last consent order appears to have expired more than twenty years ago, Defendant Neil maintains the same level of staffing previously required by that order.  (Neil Affidavit, Doc. 32-5 at ¶5).

The design of HCJC divides floors into "pods" of cells surrounding a local control location.  (Taylor Affidavit, Doc. 32-3 at ¶5).  The pods vary in size from eight to twenty-four cells with a "day area" where inmates may gather when not locked in their cells. (*Id*.).  Staffing levels for each pod group, the capacity of which is typically 112 inmates,

remain the same under current HCSO regulations as was established long ago by the *Heath* consent order.  (Doc. 32-1).

On February 9, 2013, Plaintiff was housed in Unit S42, H Pod.  (Doc. 32-1 at ¶3).  The capacity for Unit S42 is 112 inmates.  On the date of the incident, Unit S42 housed only 100 inmates.  (Doc. 32-3 at ¶6).  Additionally, none of the individual pods in that unit were at capacity.  For example, Plaintiff's H Pod had a capacity of 16, but housed 15 inmates on the date in question.  (*Id.*).  From the date of Plaintiff's admission to HCJC on January 22, 2013 through the date of the incident, the total inmate population ranged from 1104 to 1185.  Defendants admit that the population did exceed 1240 on five days, when inmates housed in intake are included in the total population count.  However, Unit S42 was never at capacity and reached 100 inmates on only two of those days.  Moreover, Unit S42 was fully staffed.  (Doc. 32-1).

Based upon the prior findings of this Court and the Sixth Circuit, and consent orders established in *Heath I-IV*, *supra*, which previously established required levels of staffing and inmate populations, Defendant Neil claims entitlement to "absolute" immunity on Plaintiff's overcrowding claim, rather than merely qualified immunity.  While absolute immunity traditionally applies to judicial officers, "[n]onjudicial officers whose official duties have an integral relationship with the judicial process are entitled to absolute immunity for their quasi-judicial conduct."  *See Ortman v. Thomas*, 894 F. Supp. 1104, 1110 (E.D. Mich. 1995)(citing *Butz v. Economou*, 438 U.S. 479 (1978)).  Thus, officials who act in reliance on judicial orders or act to enforce such orders are generally entitled to absolute immunity.  *Bush v. Rauch*, 38 F.3d 842, 847-848 (6th Cir. 1994).

In the alternative, Defendant Neil seeks qualified immunity, which applies to any government official engaged in the performance of discretionary functions, absent allegations that his conduct violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  The undersigned finds no need to examine whether absolute immunity applies to the conduct of a Sheriff who relies on compliance with population limits established in a Consent Decree that expired two decades ago, because it is abundantly clear that Sheriff Neil is entitled to at least qualified immunity from suit based on any claim of overcrowding and/or understaffing.  Plaintiff's lone allegation against Defendant Neil states that Plaintiff wants to "bring attention to the conditions and overcrowding that are plaguing this jail."  (Doc. 3 at 6).  While it is undisputed that Plaintiff was injured in inmate-on-inmate violence that occurred on February 9, 2013, there are no allegations that implicate Defendant Neil for any conduct relating to that attack.  For example, even if Plaintiff could prove that overcrowding and/or understaffing existed and contributed to the violence that occurred on February 9, 2013, there is "no support for the proposition that these deficiencies are due to deliberate indifference on the part of" Defendant Neil.  *Birrell*, 867 F.2d at 959 (granting qualified immunity to director and superintendent of substandard prison facility in part because of lack of evidence that defendants were "personally responsible for shortcomings, problems, and deficiencies."); s*ee also generally Heyne v. Metropolitan Nashville Public Schools*, 655 F.3d 556, 564 (6th Cir. 2011)(holding that in order to recover damages against a government official, a plaintiff allege with particularity "facts that demonstrate what *each*

defendant did to violate the asserted constitutional right," internal quotation marks and citation omitted).

In addition to Plaintiff's failure to allege any specific conduct by Sheriff Neil, the evidence shows that Plaintiff's conditions of confinement were not so seriously inadequate or indecent that they showed recklessness by Defendant Neil, rather than (at most) mere negligence. *Birrell v. Brown*, 867 F.2d at 958 (officials entitled to qualified immunity for overcrowding and understaffing when hampered by budget constraints). Staffing was full on Plaintiff's unit, and no "overcrowding" existed under standards previously established in *Heath I-IV*. *See also generally, Rhodes v. Chapman*, 452 U.S. 337 (1981)(reversing conclusion of this Court and finding that "double-celling" in an institution that was 38% over design capacity, did not violate the Eighth Amendment); *Agramonte v. Shartle*, 491 Fed. Appx. 557, 559-560 (6th Cir. 2012). "While crowded conditions can be restrictive and even harsh, they do not violate the Eighth Amendment unless they deprive the inmate of the minimal civilized measure of life's necessities." *Rhodes*, 442 U.S. at 347. Defendant Neil is clearly entitled to qualified immunity because his reliance on the conditions of staffing and inmate population established by the prior Consent Orders was objectively reasonable.

In response, Plaintiff argues that "Sheriff Jim Neil is responsible for all policies and procedures" and as such, "presides over a jail with systemic deficiencies in …classification, staffing, crowding and overall inmate management." (Doc. 39 at 4). Plaintiff asserts that Defendant Neil "allow[ed[ staffing levels to drop" which violated Plaintiff's constitutional rights. Plaintiff has attached a "Daily Log sheet" from February 9, 2013 in an effort to show that there was inadequate staffing on that date. However,

the log fails to support Plaintiff's claim against Defendant Neil. While Plaintiff alleges that the officers on duty on February 9, 2013 did not correctly perform their duties, that does not pertain to the "overcrowding" claim against Sheriff Neil. Plaintiff's contention that increasing the number of officers in the jail would have improved jail conditions does not disturb the conclusion that Defendant Neil is entitled to qualified immunity based upon Plaintiff's failure to show any violation of a clearly established constitutional right.

In support of his general contention that overcrowding and/or understaffing contributed to his injuries, Plaintiff also has attached as an exhibit an audit report of the Hamilton County Sheriff's Office ("HCSO") dated March 17, 2014, more than thirteen months after the incident at issue. The 2014 report states that it supplements an October 15, 2013 audit report that provided an assessment of the Sheriff's Office "at the time of the transition between administrations [a reference to the transition between the prior Sheriff, Simon Leis, and the new Sheriff, Jim Neil]." (Doc. 39-1 at 8). The lengthy 2014 audit report is critical of many things, including inadequate information technology and the lack of an adequate classification system in the Jail Services Division of the HCSO. (Doc. 39 at 4, citing Exh. G at 9-10). According to Plaintiff, the audit shows "overcrowd[ing]" to the extent that violent and non-violent offenders and inmates of the opposite sex are housed together. (Doc. 39, Affidavit at 8).

While the audit report contains recommendations for improving conditions at the HCSO, including at the jail facility, the report does not create any genuine issue of material fact concerning the conditions at the jail that existed in Plaintiff's pod more than

a year earlier, on February 9, 2013.[1] More importantly, neither the audit report nor any other evidence or argument offered by Plaintiff can overcome the conclusion that Sheriff Neil is entitled to qualified immunity as a matter of law.

### 2. Failure to Exhaust Remedies Under the Prison Litigation Reform Act

The Prison Litigation Reform Act ("PLRA") requires inmates to exhaust administrative remedies before filing suit in this Court. *See* 42 U.S.C. §1997e(a); *Porter v. Nussle*, 534 U.S. 516 (2002). Defendant has offered evidence that HCJC maintains an inmate grievance procedure that permits the filing of a grievance for any alleged violations of civil, constitutional, or statutory rights, or to resolve conditions within HCJC that create unsafe or unsanitary living conditions. (Doc. 32-5). In addition to routine grievances, an inmate may file an emergency grievance if he faces any immediate threat to his welfare or safety. (*Id.* at 2-3). Contrary to the allegations of his complaint, Defendant has presented evidence that Plaintiff filed only two grievances while at HCJC, neither of which concerned any perceived threat to his safety at the hands of fellow inmates, or the violent altercation in which he was involved on February 9, 2013. Defendant Neil seeks summary judgment based upon evidence that Plaintiff failed to file a grievance as required under the PLRA prior to turning to this Court.

In response to Defendant's motion for summary judgment, Plaintiff has filed an affidavit in opposition to the evidence presented by Defendant. According to Plaintiff's

---

[1] For example, the audit discussed a "most egregious situation" concerning "a section of the jail that houses both male and female prisoners" which was "a classic example of overcrowded conditions" in which "male and female prisoners were separated from each other by bed sheets." (Doc. 39-1 at 24). While it is unclear whether that particular condition existed on February 9, 2013, there is no evidence (or even allegation) that the condition described had any relevance to the conditions that existed in H Pod, where the incident between Plaintiff and other male inmates occurred.

recent affidavit,[2] he notified staff via the emergency grievance system on February 5, 2013 that he was "fearful[]" of an inmate in cell 54 who was manufacturing a weapon in the protective custody unit in which Plaintiff was housed.[3] (Doc. 39 at 5, ¶6; Doc. 39-1). However, the copy of the "grievance" to which Plaintiff refers is the same as that reasonably interpreted by Defendant as expressing concern over possible drug trafficking on the unit. The grievance reads, in its entirety:

> This is not a grievance it is an inmate informing US of situations happening on the unit. Inmate sts inmates in cells 54 and 56 are involved in trafficking of wellbutrin and two other psych meds while the "AB" in cell 54 sells them to the porters. Inmate has seen the two of them grinding up the meds and snorting them. The black guy in 54 acts as a holder and lookout. Inmate sts a possible shank being used and "AB" is trying to break the plexi glass sign holder on the door to make a weapon while the "Fag" has a very sharp colored pencil.

The response section of the same form states: "Not really a grievance but information about situation on S4H. Sgt Sparks called and he came to my office to pick up copies of several grievances, including this one." (Doc. 39-1 at 3).

As Defendant points out, even if the above "grievance" could be interpreted as notice that Plaintiff was fearful of other inmates, rather than a grievance alerting authorities to possible drug activity in his pod, Plaintiff still has not provided evidence of any grievance concerning a complaint of <u>overcrowding</u> or understaffing that would

---

[2] The prior R&R also pointed out that Plaintiff "does <u>not</u> allege that he alerted either Defendant Jones or Smucker to any particular threat from his attackers. In fact, he does not allege that he informed any Defendant of any specific threat to his health or safety made against him by anyone." (Doc. 29 at 8-9, emphasis added). Plaintiff filed no objections to that R&R; his recent affidavit makes this allegation for the first time. Indeed, the two Defendant Officers were previously dismissed in part based upon Plaintiff's failure to allege that they had any knowledge of a threat to Plaintiff's safety in H Pod that would satisfy the objective or subjective components of his Eighth Amendment claim.

[3] Plaintiff avers that he notified staff upon his arrival at HCJC that he was a confidential informant, and pursuant to that notification, was housed in the protective custody unit, H Pod.

13

satisfy the exhaustion requirement under the PLRA and subject Sheriff Neil to liability. For that reason, Defendant's alternative argument – that he is entitled to judgment as a matter of law on the overcrowding claim due to Plaintiff's failure to exhaust – remains persuasive.

Plaintiff additionally avers that on February 9, 2013 at the time of the altercation, only one officer (Jones) was logged into the computer during the entire shift, thereby offering inferential proof that staffing was inadequate. (*See* Doc. 39, Sexton Affidavit at 9-13). However, Plaintiff's allegations regarding any failure of Officer Jones and/or Officer Smucker to comply with jail policies do not implicate Defendant Neil.

### III. Conclusion and Recommendation

For the reasons stated, **IT IS RECOMMENDED THAT:**

1. The motion of Defendant Sheriff Neil for summary judgment (Doc. 32) should be GRANTED; and

2. That this case should be DISMISSED and CLOSED.

                                       */s Stephanie K. Bowman*
                                       Stephanie K. Bowman
                                       United States Magistrate Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

JOHNATHAN SEXTON,                                   Case No. 1:14-cv-26

    Plaintiff,                                              Dlott, J.
                                                    Bowman, M.J.
  v.

INSTITUTIONAL INSPECTOR MAHALMA, et al.,

    Defendants.

## NOTICE

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report and Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R.  That period may be extended further by the Court on timely motion by either side for an extension of time.  All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections.  A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).